UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS L. HARRISON, | No. C 07-959 SI (pr) |
| Plaintiff, | **ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT** |
| v. | |
| OFFICER J. SAMPLE, | |
| Defendant. | |

## INTRODUCTION

Marcus L. Harrison, a California prisoner, originally filed this pro se civil rights action in the Del Norte County Superior Court and defendant later removed the action to federal court because the complaint alleged a claim under 42 U.S.C. § 1983. Defendant has moved for summary judgment and plaintiff has opposed the motion. For the reasons discussed below, the motion for summary judgment will be granted. Judgment will be entered in defendant's favor.

## BACKGROUND

This case concerns a correctional officer's response to a prisoner's request for his asthma inhaler one day in the security housing unit ("SHU") at Pelican Bay State Prison. The Pelican Bay SHU was perhaps the most restrictive housing in the California prison system. Inmates were handcuffed and searched any time they left the pod, although in Harrison's unit, the inmates apparently could be let out of their cells without handcuffs and without an escort, but were only let out one at a time (unless with a cellmate) and only to go to a specific destination (e.g., the

1  exercise yard or shower).  Some inmates were in cells with Lexan fronts.[1]

2  The following facts are undisputed unless otherwise noted.

3  The incident took place on June 16, 2005 in the SHU.

4  Marcus Harrison was an inmate in the SHU.  He was serving a sentence of life with the
5  possibility of parole on a 1997 conviction for attempted murder.  His chronological movement
6  history sheet showed numerous instances of credit losses for disciplinary offenses.  See Feudale
7  Decl., Exh. C.  Harrison was housed in the SHU in a cell with a Lexan front.

8  Jeffrey Sample was a correctional officer ("C/O") at Pelican Bay.  On June 16, he worked
9  the third watch shift, from 2:00 p.m. until 10:00 p.m.  He was the control booth officer in Unit
10 D-3 of the SHU, watching over 48 cells.

## A. The Lay-Out Of Housing Unit D-3.

Unit D-3 had six different individual housing units or pods, which were arranged in a "T" shape with two pods located on each arm of the "T."  Each pod had eight cells: four on the first tier and four on the second tier.  The first tier of a pod had a shower room, next to which there were four individual cells with Lexan fronts, next to which there was a door that led out to that pod's recreation yard.  There also was a stairway at the end of the pod that led from the first to second tier.  All cells in the pod were on the same side of the wall, such that each inmate looked out of his cell to see a wall and did not have a direct line of vision to another cell.

The control booth was located in the middle of the "T," on the second floor of the unit, above the doorways to the pods.  The control booth had windows looking out into each pod which could be opened and closed.  These windows were designed so that the control booth officer could look into each pod, but not into each individual cell within a pod.  It is undisputed that the control booth operator could not see into Harrison's cell from the control booth.  The

---

[1] Lexan has been described in many prisoner cases as a plexiglass-type material, a sheet of which is put in front of an inmate's cell to prevent him from launching projectiles of various sorts at persons walking past the cell. A common complaint is that the Lexan reduces the air circulation in the cell.

2

booth had controls that allowed the control booth officer to remotely open and close each cell door as well as the doors leading to each pod, recreation yard and shower.

Many SHU inmates' prescription medications were kept in the control booth and were provided to the inmate upon request when there was floor staff available to take the medication from the control booth to the individual inmate's cell. Due to safety and security concerns, a control booth operator was prohibited from leaving his post to deliver prescription medications to the inmate's cell. However, in an emergency situation, a control booth officer could summon medical personnel to deliver medication to an inmate.

Sometimes a control booth operator would let an inmate out of his cell to get his medication dropped to him from the control booth. Harrison Depo., RT 59-60. Although inmates did not believe there was any security risk attendant to letting an inmate out of his cell when floor staff was not present to bring the medication to him, C/O Sample explained the risks associated with letting an inmate out of his cell to retrieve medication from the control booth.

> While there have been occasions where control booth officers have allowed the inmate out of his cell and have dropped the inmate's medication down from the control booth to the inmate standing below on the first tier of a pod, this procedure is discouraged for four reasons: 1) allowing an inmate out of his cell provides the inmate with an opportunity to pass notes, inmate-manufactured weapons, or other contraband to other inmates within his pod; 2) allowing an inmate out of his cell provides the inmate with an opportunity to assault the control booth operator while he is tossing the medication to the inmate, or to use an inmate-manufactured weapon to spear another inmate locked in his cell; 3) if a control booth officer were to lean down through the control booth window to drop an inmate his medication, the inmate could grab the control booth officer's rifle or pepper spray and use these weapons to harm other inmates and staff, or effect escape; and 4) if a control booth officer tosses the inmate his medication into the pod, his attention is temporarily diverted toward the inmate who is out of his cell and away from the other inmates located in the five other pods.

Sample Decl., ¶ 6.

Harrison's cell was on the first tier of the pod and was the furthest away from the control booth. One witness estimated Harrison's cell was about 45-50 feet from the control booth window. Clement Depo., RT 25. He had to raise his voice louder than other inmates to be heard because he was in a Lexan-fronted cell. Pinell Depo., RT 32.

3

B.   Harrison's Asthma and Asthma Inhaler

Harrison had asthma at the time of the incident. The parties provide relatively little information about asthma or asthma attacks. Harrison gives a summary of his medical information showing that there were different kinds and degrees of asthma attacks: "The initial symptoms of an asthma attack are generally shortness of breath, coughing, or chest tightness. . .asthma attacks sometimes have a sudden onset that can rapidly progress to pronounced wheezing and shortness of breath, & in other instances, the asthma attack starts slowly and symptoms gradually increase in intensity." Harrison 11/28/07 Decl., ¶ 10. The narrowing of the airways in asthma, called bronchoconstriction, that made breathing difficult, "can vary in frequency, duration, and severity." Id.

The prison's chief medical officer, Dr. Sayre, provides some basic information about the purpose of an asthma inhaler during an asthma attack. "Asthma is a condition which causes an individual's airways to become inflamed or swollen, which in turn restricts the airflow to an individual's lungs. As a result, an individual must breathe harder in order to allow more air to pass into his lungs. An asthma inhaler alleviates these symptoms by temporarily relaxing the tightened muscles around an individual's airways, allowing an individual to breathe more freely." Sayre Decl., ¶ 4. Dr. Sayre does not state that Harrison had an asthma attack, but provided this information to elaborate on his opinion that Harrison most likely did not lose consciousness.

Harrison had two asthma inhalers in 2005. Harrison Depo., RT 29. His albuterol inhaler was "for emergency relief, like if you are having trouble breathing," and his Azmacort inhaler was "for typical use, day-to-day use." Id. His albuterol inhaler was among the medications kept in the control booth.

There is no competent evidence that Harrison's albuterol inhaler was marked as an emergency medicine. Harrison suggests that his medical records supported his statement that it was emergency medicine, but those records do not show how the inhaler was labeled. In fact, the medical records appear to be consistent with C/O Sample's statement that the asthma inhaler was labeled "as needed" and "maintenance." Sample Decl., ¶ 7; Complaint, Exh. D (5/4/05 note lists one of his medications as "albuterol inhaler [illegible] puffs [illegible] prn wheezing/SOB

4

1 x 90 days," 6/28/05 note lists one of his medications as "albuterol inhaler [illegible] puffs BID
2 prn wheezing/SOB x 30 days").[2]

3 Harrison states that he was informed by several unnamed doctors that "the sole purpose
4 for my albuterol asthma inhaler that was prescribed to me was to serve in the capacity of offering
5 the plaintiff 'emergency relief' when and if the plaintiff is experiencing difficulty breathing, or
6 shortness of breath." Harrison 11/28/07 Decl., ¶ 12. There is no evidence that this information
7 was known to C/O Sample. Harrison did not have a medical chrono indicating that he was to
8 be given his inhaler immediately upon request, although in past years he had seen other inmates
9 obtain chronos to have the inhalers in their cells in the SHU.

11 C. The Requests For The Inhaler And The Response

12 The parties agree that Harrison twice called out for his asthma inhaler. Harrison first
13 called to control booth operator Sample for his inhaler at about 6:20 p.m. Harrison did not
14 specifically tell the control booth operator he was having an emergency at that point, but just that
15 he needed to use his inhaler. Harrison Depo., RT 31-32; Pinell Depo., RT 46; Zavala Depo., RT
16 42; but see Clement Depo., RT 30. When Harrison called to the control booth operator the first
17 time, he was experiencing shortness of breath and was coughing. Id. at 39-40.

18 Control booth operator Sample responded that Harrison would have to wait until the 9:00
19 p.m. cell count for his inhaler. Harrison Depo., RT 55, 57. Harrison states that Sample did not
20 tell him there was not floor staff available to bring the inhaler to him. C/O Sample states that
21 the floor staff was not available to bring Harrison his inhaler because dinner recently had been
22 served and floor staff was busy picking up food trays from inmates' cells and returning the food
23 trays to the kitchen. Because there was no floor staff available at the time to deliver Harrison's
24 inhaler, he told Harrison he would have to wait until floor staff arrived before he could use his
25 inhaler. When Harrison made his initial request, C/O Sample did not hear any signs indicating
26 that Harrison needed immediate medical attention, e.g., he did not hear him coughing, wheezing

28 [2]"BID" means "twice a day" and "prn" means "as occasion arises." See Stedman's Medical Dictionary (28th ed. 2006), pp. App.-14, App.-21.

5

or gasping for air, and Harrison's tone of voice did not indicate to Sample that he was having a medical emergency.

Harrison called to the control booth a second time. He called out 10-15 minutes later or just moments later – the parties disagree as to how many minutes passed between requests. This time Harrison was angry (because the control booth operator had been ignoring the requests by him and other inmates) and was yelling to get the control booth operator's attention. Harrison Depo., RT 42-43. Harrison again said he needed to use his inhaler. As with the first request, Harrison did not specifically state that he was having a medical emergency, although the other inmates thought it was becoming an emergency. See Pinell Depo., RT 46; Zavala Depo., RT 44. Harrison said he was having trouble breathing. C/O Sample again told Harrison that he would have to wait – until 9:00 p.m. (according to Harrison) or until floor staff was available (according to Sample).

Meanwhile, other inmates were aware of the situation and got involved. Inmates yelled to the control booth operator messages to the effect that "this guy need to use his prescribed medications. He's having medical problems." Harrison Depo., RT 50. Harrison remembers inmates Frank Clement, Hugo Pinell and Randolph Zavala as well as others calling out to the control booth. Harrison Depo., RT 50-51. The descriptions indicate that it was a rather loud disturbance with lots of yelling. See Harrison Depo., RT 51-52 ("it was a big ole raucous. I mean, for a person had to be deaf or using a hearing aid not to hear all these people yelling and screaming trying to get his attention"); Clement Depo., RT 76 (prisoners "became chaotic in the pod"); id. at 78 (sounds echo and become amplified in the pod); Pinell Depo., RT 47 (Pinell called out, "'Hey, man, what's happening?'" [b]ecause there was no need [for the guard] to take an attitude about anything like that.") Other inmates – perhaps the whole pod -- hollered and said things like, "let him out. Let the man out to use his inhaler." Pinell Depo., RT 54, 54. Inmate Clement called out to the control booth operator that he needed to get his own inhaler – not because he needed it but because he wanted to tell the control booth operator that Harrison was having an asthma attack. The operator responded that Clement also would have to wait until the 9:00 p.m. mail pickup. Eventually, the control booth operator said, "shut up" and closed the

6

sliding window in the control booth to reduce the noise level.  Zavala Depo., RT 60, 62.

C/O Sample states that he did not hear any other inmates call up to him to inform him that Harrison was having trouble breathing and needed to use his inhaler or call out "man down." None of the inmate-witnesses had ever been in the control booth and therefore had no personal knowledge of what could and could not be heard or seen from there; however, the evidence is rather clear that inmates and control booth operator communicate with each other generally by yelling back and forth.  The inmates thought the control booth operator must have heard Harrison's coughing and wheezing, although they admitted he never did anything to indicate that he did.  The inmates did not know whether the control booth operator heard Harrison fall. Sample could not have seen whether Harrison was having a medical emergency in his cell because the control booth operator had no direct line of sight into Harrison's cell.  Harrison Depo., RT 44, 48.

Clement called out "man down" after he heard Harrison fall and called out to him but received no response.  He called out after he heard Harrison fall, which was after Sample had shut the window in the control booth.  Clement Decl., ¶¶ 7-8.

Harrison states that, after the second exchange with C/O Sample, he had an asthma attack and lost consciousness.

Harrison did not ask to see a doctor or to see an MTA at any time that night.  Harrison did not notify any member of the correctional or medical staff that night or in the following days that he had fallen and hit his head.

C/O Sample asked two people to check on Harrison that night.  He told the MTA who came to the unit to dispense routine medications at about 7:00 p.m. that Harrison had requested to use his inhaler, and asked her to speak with Harrison.  The parties disagree whether the MTA actually made any inquiry of Harrison. At about 8:45 p.m., C/O Sample asked C/O Richcreek, the floor officer who showed up for the 9:00 head count, to check with Harrison about his request to use his inhaler.  A correctional officer did walk by Harrison's cell at about 9:00 p.m. but Harrison did not tell him anything about needing his inhaler.  Harrison Depo., RT 54. Inmates Clement and Zavala overheard some kind of conversation between Harrison and the

7

1  officer. Clement Depo., RT 40; Zavala Depo., RT 71. Harrison did not tell that correctional
2  officer that he need to use his inhaler because he "had rejuvenated and refreshed" himself.
3  Harrison Depo., RT 57. When Pinell asked the correctional officer who had walked through the
4  pod about Harrison, the correctional officer said he had looked in on him. Pinell Depo., RT 68-
5  69. When C/O Richcreek exited the pod, he told C/O Sample that Harrison was fine.

7  D.     Harrison's Injuries
8       The parties disagree as to whether Harrison lost consciousness and bumped his head or
9  otherwise injured himself. C/O Sample presents declarations from the chief medical officer and
10 another correctional officer at the prison who state that inmates generally do not let injuries,
11 especially serious ones, go unreported. The chief medical officer also states that it was highly
12 improbable that Harrison passed out because, if he passed out during an asthma attack and
13 remained unconscious for a prolonged period of time, he likely would have died due to
14 asphyxiation.
15      On the other hand, Harrison presents evidence that he did pass out and lose
16 consciousness. In addition to his own declaration, Harrison's inmate-witnesses claimed to have
17 heard two thumps that they were able to discern were the sounds of him hitting the door and
18 falling to the floor – notwithstanding that two of those three inmate-witnesses were on another
19 tier, and the third inmate witness was (like Harrison) in a cell with a Lexan front. Harrison states
20 that he experienced 20-25 minutes "of violent & uncontrollable breathing," then lost
21 consciousness, fell on the floor, and awoke about 1-1/2 hours later at about 8:20 "to the sight of
22 a pool of blood & saliva on my cell floor." Harrison 9/1/07 Decl., ¶¶ II-V. Harrison explains that
23 he did not seek medical attention when he regained consciousness because of Sample's failure
24 to help him when he earlier requested assistance. Harrison 11/28/07 Decl., ¶ 14. After he
25 regained consciousness, he "primarily just, you know, kicked back, took it easy, rested up. But
26 next day I was back to normal program." Harrison Depo., RT 64. The day after the fall he
27 noticed that he had a big knot on the side of his head and swollen lips.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at Pelican Bay State Prison in Del Norte County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, when a party challenges the merits of the opponent's claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28

9

U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The complaint was not made under penalty of perjury and therefore is not considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. Id. at 631.

## DISCUSSION

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 102-04 (1975). To prove that the response of prison officials to a prisoner's medical need was constitutionally deficient, the prisoner must establish (1) a serious medical need and (2) deliberate indifference to that need by prison officials. See McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id. at 1059 (quoting Estelle, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health by failing to take reasonable measures to abate it. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. Id.

Where, as here, there was some response but the complaint is about the timeliness of that response to the medical condition, the temporal component is best considered as part of the subjective prong rather than the objective prong of the deliberate indifference test. See, e.g., Plemmons v. Roberts, 439 F.3d 818, 823-24 (8th Cir. 2006) (response to complaints of heart

10

1  attack symptoms). The need for speed goes to whether the official took the "reasonable
2  measures" mentioned in Farmer, 511 U.S. at 837. It is not the law that anything other than
3  instantaneous response to any medical complaint is an Eighth Amendment violation, as both
4  incarcerated and unincarcerated people must endure some waiting time for almost any medical
5  care, whether it be a few hours in an emergency room or a few months for a doctor appointment.
6  Although the response time and the quality of the response fit under the subjective prong, the
7  objective condition also must be properly identified to determine the reasonableness of the
8  response – here, it makes a difference if the objective condition is defined as asthma in general
9  or an asthma attack in particular when one examines the reasonableness of the response. (For
10 example, while both high blood pressure and heart attacks are serious, the need for immediate
11 medical attention to the latter is far greater and a response time of one month might be
12 acceptable for high blood pressure but wholly unacceptable for a heart attack.) The Eighth
13 Amendment analysis in a delayed response case requires a plaintiff to prove (or, at the summary
14 judgment stage, to raise a triable issue of fact) that a delay occurred to an inmate with a problem
15 so severe that a delay would cause significant harm and that the defendant knew this to be the
16 case. Cf. Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002).

17      The medical condition here was an asthma attack. There are triable issues of fact as to
18 whether Harrison had an asthma attack, lost consciousness, and whether an asthma attack is a
19 serious medical condition. Harrison presents evidence that his ability to breathe became so
20 inhibited that he lost consciousness. An inability to breathe causing unconsciousness qualifies
21 as a situation that a reasonable doctor or patient would find important and worthy of comment
22 or treatment. See McGuckin, 974 F.2d at 1059. Defendant presents evidence that it was at least
23 highly unlikely that Harrison lost consciousness, but that evidence merely shows there is a
24 disputed issue of fact. The objective prong of the deliberate indifference test is satisfied.

25      There is not a triable issue of fact as to the subjective prong, however, as there is an
26 absence of evidence that C/O Sample acted with the deliberate indifference necessary for an
27 Eighth Amendment claim. C/O Sample has provided evidence that he did not perceive the
28

11

situation to be a medical emergency and took reasonable measures to address the medical care request of which he learned. See generally Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003) (urgency of arrestee's protestations about his diabetic condition and need for food, as well as his extreme behavior and sickly appearance supported an inference that the officers knew of the risk of harm to arrestee in not providing food); but cf. id. at 422 (partial concurrence and partial dissent) (evidence that some deputies knew arrestee was diabetic did not establish that any deputy knew of the risk to arrestee if he did not receive food, i.e., no evidence that the deputies actually drew the inference that arrestee was at a substantial risk of serious harm).

   The undisputed evidence shows that Sample did not know that Harrison was having a medical emergency and needed his inhaler immediately and could not wait a couple of hours for floor staff to bring it to him. First, there is no evidence that Sample saw or heard any signs that Harrison was having a recognizable medical emergency. Harrison did not specifically say he was having a medical emergency when he twice requested his inhaler. Second, the inhaler stored in the control booth was not labeled as emergency medication, and critical medications were not stored in the control booth. Because of this, Sample understood that Harrison was only to be provided with access to the inhaler when it was safe to do so. Third, Sample did take steps to address Harrison's requests, albeit not in an emergency manner. Sample told the MTA making rounds at about 7:00 p.m. that Harrison requested use of his inhaler and to check on him. Sample also asked the floor officer at about 8:45 p.m. to check on Harrison during cell count. Neither of those staff members alerted Sample to any problem with Harrison. Fourth, Harrison never requested to see an MTA or a doctor that night – before, during or after his asthma attack. Fifth, the reason Sample wanted Harrison to wait was because there was not floor staff available to deliver the medication that he believed was not critical and it presented an unnecessary security risk to let the inmate out of his cell. Sample did not delay just for the sake of delay.

   Harrison presents evidence that he collapsed and went unconscious as a result of his untreated asthma attack. Defendant disputes that Harrison lost consciousness, but on summary judgment, the court accepts the non-movant's version. Doing so does not aid Harrison, however,

1  because the parties agree that Sample could not see into Harrison's cell.  Sample's acquisition
2  of information would have been by hearing it, and his ability to hear would have been reduced
3  by the fact that Harrison was in a first floor cell furthest away from the control booth and was
4  in a Lexan-fronted cell. The evidence does not show or support an inference that Sample heard
5  him collapse or lose consciousness or wheezing or coughing.  Another inmate (also in a cell with
6  a Lexan-front) called out "man down" but did not do so until after Sample had shut the control
7  booth window, and Harrison provided no evidence that Sample could hear the inmates' voices
8  once he shut the control booth window – indeed, the inmates believed Sample shut the window
9  so he would not have to listen to them.

10  C/O Sample was not a health care provider.  He was faced with a high security inmate's
11 assertion that he needed his medication but also faced with information that the medication was
12 maintenance and would not be in the control booth if it was critical medication.  C/O Sample
13 also believed that letting the inmate out of his cell to get the medication would pose a security
14 risk and no staff member was then available to bring it to the inmate.  (Harrison apparently
15 disputes that it would be a security problem to let him out of his cell.  Although normally the
16 court draws all justifiable inferences in the non-movant's favor at the summary judgment stage,
17 in disputed matters of professional judgment, the court's inferences must accord deference to the
18 views of prison authorities.  <u>Beards v. Banks</u>, 126 S. Ct. 2572, 2578 (2006).)  Even Harrison's
19 evidence shows that not all asthma attacks are the same; he reports that "attacks sometimes have
20 a sudden onset that can rapidly progress to pronounced wheezing and shortness of breath, & in
21 other instances, the asthma attack starts slowly and symptoms gradually increase in intensity."
22 Harrison 11/28/07 Decl., ¶ 10.   The narrowing of the airways in asthma, called
23 bronchoconstriction, that made breathing difficult, "can vary in frequency, duration, and
24 severity."  <u>Id.</u>   Sample's decision to wait until a floor officer was available in a couple of hours
25 to bring the inhaler to Harrison's cell was a reasonable measure in response to the situation as
26 Sample perceived it.  Harrison has not raised a triable issue of fact that his problem was so
27 severe that a delay would cause significant harm <u>and</u> that C/O Sample knew this to be the case.
28

13

1  Cf. Hallett, 296 F.3d at 746.

2  Several of Harrison's arguments warrant separate discussion. First, he argues that the
3  albuterol inhaler "is specifically designed to act as 'emergency relief.'" Opposition, p. 2. The
4  inquiry on the subjective prong of an Eighth Amendment claim is the defendant's knowledge and
5  not the design or purpose of medication, unless the defendant knows of it. The evidence is
6  undisputed that Sample did not know the albuterol inhaler to be emergency medication that had
7  to be dispensed immediately upon request.

8  Harrison repeatedly uses the reasonable man standard in his opposition, but that is the
9  wrong standard for an Eighth Amendment claim. For an Eighth Amendment violation, it is
10 necessary that the defendant actually know of and disregard a risk of harm, rather than that he
11 merely should have known of it.

12 Harrison challenges Dr. Sayre's declaration, arguing that Dr. Sayre is not qualified to
13 speak about asthma because he is not a pulmonary specialist. Harrison has not made any
14 credible showing that the basics of a rather common ailment like asthma are beyond the ken of
15 a person holding a medical degree. He also complains that Dr. Sayre never examined him, but
16 that is irrelevant because Dr. Sayre does not purport to offer an evaluation of Harrison but only
17 to explain the basic medicine of asthma and inmate complaint patterns.

18 Harrison urges in his opposition that C/O Sample made inconsistent statements about the
19 name of the floor officer and "this point is critical." Opposition, p. 9. In light of the general
20 agreement of plaintiff, defendant and the inmate-witnesses that some correctional officer walked
21 by Harrison's cell at the 9:00 cell count, C/O Sample's mistaken identification of who that person
22 was makes no difference at this point. Sample corrected his mistaken identification during
23 discovery in this case, so there is no prejudice to Harrison. On a related note, Harrison
24 complains that the floor officer, C/O Richcreek, did not personally examine him to see the extent
25 of his injuries. Opposition, pp. 14-15. However, Harrison did not ask Richcreek for any medical
26 assistance or complain of any problem to him, so there was no occasion for Richcreek to
27 "examine" him. Moreover, Harrison did not want any attention at that point in time, allegedly
28

14

because of Sample's allegedly bad attitude and failure to help him earlier in the evening.

Harrison argues that state law requires a correctional officer who is informed of an emergency to report without delay to the officer in charge. This does not advance his position because Sample did not know the situation was an emergency.

Viewing the evidence in the light most favorable to Harrison, a reasonable jury could not conclude that C/O Sample knew Harrison was having an asthma attack that required immediate use of the albuterol inhaler and deliberately disregarded it. C/O Sample may have acted too slow for Harrison, but the evidence does not support a finding that he acted with the deliberate indifference required to support an Eighth Amendment claim. Sample is entitled to judgment as a matter of law in his favor on the merits of Harrison's claim. Sample also is entitled to judgment as a matter of law on his defense of qualified immunity because there was no constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001)

## CONCLUSION

For the foregoing reasons, defendant is entitled to judgment as a matter of law on plaintiff's complaint. Defendant's motion for summary judgment is GRANTED. (Docket # 16.) Judgment will be entered in favor of defendant and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: May 27, 2008

_____
SUSAN ILLSTON
United States District Judge

15